IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE ESTATE OF RACHEL M. HAMMERS,
DECEASED, et al.,

       Plaintiffs,

       v.

DOUGLAS COUNTY, KANSAS BOARD OF
COMMISSIONERS, et al.,

       Defendants.

Case No. 15-7994-CM

## MEMORANDUM AND ORDER

On May 12, 2012, Rachel M. Hammers died in her cell at the Douglas County Corrections Facility ("DCCF"). Her estate and three minor children, through her father Joseph M. Harvey, the administrator of the estate and conservator of the children, bring this action against Douglas County, Kansas Board of Commissioners ("BOCC"), and Sheriff Kenneth M. McGovern and Undersheriff Kenneth L. Massey in their individual and official capacities. Plaintiffs claim that Hammers's death was the result of inadequate policies or practices implemented by defendants and because of inadequate training as to the proper implementation of policies and practices. The matter is currently before the court on defendants' Motion for Summary Judgment (Doc. 208). For the reasons discussed below, the court grants defendants' motion in part and denies it in part.

**I.    Background**

a.  Hammers's Death

The following facts are summarized and viewed in the light most favorable to plaintiff. There is little dispute as to the general events that took place leading up to Hammers's death. Hammers suffered from alcoholism and had a history of seizures, high blood pressure, and alcohol withdrawal. On February

24, 2012, Hammers pled guilty to two counts of Driving Under the Influence in Douglas County District Court and was sentenced to 12 months of supervised parole in lieu of six months incarceration.  She was also ordered to serve 48 hours on each charge.  Prior to this incarceration, Hammers consulted with her primary care physician, Dr. Molly Imber, regarding her concerns with alcohol withdrawal and hypertension.  Hammers was afraid of having another seizure while incarcerated.  Dr. Imber prescribed a tapering course of Librium for alcohol withdrawal and faxed Hammers's medical records to DCCF.

When Hammers arrived at DCCF on March 23, 2012 to serve her sentence, DCCF staff conducted a Booking Initial Assessment ("BIA") in which Hammers reported a history of depression, daily alcohol use, a history of alcohol withdrawal, related seizures, and high blood pressure.  She also reported taking medications for depression and high blood pressure and Librium to prevent seizures.  While Hammers was incarcerated during this time, she experienced both moderate and severe alcohol withdrawal. She was released on March 27, 2012.

On April 5 and April 12, 2012, the Douglas County District Court issued bench warrants for Hammers's arrest due to parole violations.  On April 19, 2012, Hammers checked herself into Lawrence Memorial Hospital for alcohol intoxication, depression, and suicidal thoughts.  She was arrested again on April 22, 2012 and during her BIA she reported a history of depression, monthly alcohol use, a history of alcohol withdrawal-related seizures, and high blood pressure.  She reported taking medication for depression and high blood pressure and Librium to prevent seizures. Hammers was incarcerated at DCCF until April 30, 2012 without any incidents related to alcohol withdrawal.

On May 3, 2012, the Douglas County District Court issued a third bench warrant for Hammers's arrest for failing to appear on a parole violation charge.  On the morning of May 11, 2012, Hammers called her mother, Mary Harvey, requesting help with her children because the police were at her door. Mary Harvey picked up Hammers's daughter, drove her to school, and then ran errands.  When she

arrived back at Hammers's apartment around 10:00 a.m., she found Hammers intoxicated. Later that afternoon, Mary Harvey and Rachel's father, Dr. Joseph Harvey, decided to call the police. Around 4:30 p.m., police arrived and noted in the arrest report that Hammers was "drunk" but cooperative. At 5:57 p.m., Officer Troy Miller conducted Hammers's BIA. In the BIA, Officer Miller noted that pursuant to his observation, Hammers was not alcohol intoxicated and did not display withdrawal symptoms. Hammers reported to Officer Miller that she had depression and high blood pressure and had a seizure in 2010. She reported that she drank alcohol daily and had her last drink at 10:00 a.m. that day. Based on his observations, Officer Miller did not see any indication Hammers had any mental or physical problems before he transferred her to the housing unit. Pursuant to DCCF policy, Hammers was scheduled to see the nurse the following day.

At approximately 6:45 p.m., Hammers arrived in the women's housing pod. Officer Megan Walker briefed Hammers and provided her an Inmate Handbook. She did not notice Hammers displaying any symptoms of alcohol withdrawal. Hammers was placed in a cell with another inmate, Ashley Dubree, who also did not notice Hammers demonstrating any signs or symptoms of withdrawal and did not consider Hammers to be drunk.

The overnight officer who performed "well checks" throughout the women's pod every 30 minutes did not report any issues of concern involving Hammers. At approximately 7:15 a.m. on May 12, 2012, Dubree and Hammers left their cell to obtain a meal tray. After 15 or 20 minutes, they returned to their cell and went back to sleep. Dubree noticed Hammers was snoring and sounded like she was congested and having a hard time breathing, but otherwise did not think anything was wrong with her. At some point, Officer Walker called Dubree and Hammers to tell them to take a shower and clean up their cell. Dubree eventually finished cleaning the cell and left to take a shower. Officer Walker used the intercom system to ask Hammers if she wanted to take free time. When she did not respond, Officer

Walker opened the door to the cell to ask Hammers if she wanted free time, and Hammers appeared to be sleeping.  Officer Walker contacted another officer for back-up, but decided to enter the cell alone. She shook Hammers to try to wake her, and when she did not respond, Officer Walker called a code 900 medical emergency.  After determining Hammers did not have a pulse, Officer Walker began CPR.  At 10:04 a.m., EMTs from the Lawrence Douglas County Fire and Medical entered the cell and took Hammers to Lawrence Memorial Hospital, where she was pronounced dead at 10:46 a.m.  The cause of death on Hammers's death certificate listed sudden death due to seizure disorder probably related to ethanol withdrawal due to chronic ethanolism.

     b.  DCCF Operations

Because plaintiffs' claims focus on policies and procedures at DCCF, it is necessary to summarize any relevant police and procedures for purposes of this order.  Prior to Hammers's death, Douglas County acknowledged a high incidence of alcohol dependency among DCCF inmates.  In a response to a Request for Proposals issued by the City of Lawrence for 2009 Alcohol Tax Funds, the Douglas County Sheriff's Office – Corrections Division, requested funds for substance abuse therapies and care for inmates.  Year-end reports in 2009, 2010, 2011, and 2012 issued by DCCF note that many times arrestees are brought to jail under the influence of alcohol and drugs.

Defendant Sheriff McGovern and defendant Undersheriff Massey (who served as the Corrections Division Undersheriff) were responsible for the safety of DCCF prisoners.  The Corrections Division Policy and Procedure Manual contains departmental policies that pertain to the operations of the corrections division.  This includes policies and procedures for the booking, house, and medical units. The BOCC was responsible for developing medical contracts for DCCF.  On January 10, 2011, the BOCC approved and executed contracts with Dr. Dennis Sale and the Visiting Nurses Association ("VNA") to provide medical services for DCCF.  Both contracts are between the practitioners and the

BOCC and are signed by the chair of the BOCC.  The contracts outline the duties of the providers, including providing comprehensive health care to inmates and to provide policies and procedures for health services specifically developed for [DCCF] in accordance with American Correctional Association ("ACA") standards.  The contract also specifies the hours of services for the providers. According to the contracts, Dr. Sale was to provide an on-call physician 24 hours a day, 7 days a week, and a licensed physician on-site two days per week for a minimum of three hours a day.  Under the VNA contract, VNA was to provide a 24/7 on-call system for nursing staff and the following on-site schedule:

> 3.   Hours of Services.  VNA shall provide the Services during the following days and times:
>
> A.   On Monday through Friday, VNA shall provide on-site staff (at the Facility and not elsewhere), as follows:
>
> One Registered Nurse Supervisor from 8:00 a.m. to 4:00 p.m.
> One Licensed Practical Nurse from 8:00 a.m. to 12:00 p.m.
> One Certified Medication Aide from 6:00 a.m. to 2:00 p.m. (subject to changes in schedule, but not total hours, to accommodate Jail physician's schedule).
> One Licensed Practical Nurse or Registered Nurse, at VNA's option, from 3:00 p.m. to 11:00 p.m.
>
> B.   On Saturday and Sunday, VNA shall provide on-site staff (at the Facility and not elsewhere), as follows:
>
> One Certified Medication Aide from 6:00 a.m. to 10:00 a.m. and from 6:00 p.m. to 10:00 p.m.
> One Licensed Practical Nurse or Registered Nurse, at VNA's option, from 10:30 a.m. to 5:30 p.m.

(Doc. 221-21, at 2.)  Therefore, at the time Hammers arrived at DCCF until the time she was taken to the hospital, the personnel scheduled to be at DCCF were:

- One Licensed Practical Nurse[1] ("LPN") from 3:00 p.m. – 11:00 p.m. on Friday May 11

- One LPN from 10:30 a.m. – 5:30 p.m. on Saturday May 12

---

[1] An LPN can provide nursing services under the direction of a registered nurse or a physician, but does not have the authority to diagnose.  An LPN can provide basic clinical examination such as blood pressure or taking a pulse, but a registered nurse is the only one who does an assessment and develops a plan of care.  (Doc. 222-35, at 4; Doc. 222-5, at 8.)

- One Certified Medication Aide[2] from 6:00 a.m. – 10:00 a.m. on Saturday May 12

Therefore, during Hammers's incarceration from May 11 until her death on the morning of May 12, there was no medical staff on-site that was qualified to develop a plan of care or diagnose her with any ailments. If, however, an inmate required medical treatment when medical staff was not present or the medical staff on-site was not qualified to make diagnoses, the inmate would be transferred to Lawrence Memorial Hospital.

The Douglas County Sheriff's Office Corrections Division Policies and Procedures, Policy 7.1 Arrestee Admission Procedures outlines the procedures for arrestee arrival and the booking/intake process. According to Policy 7.1, the Booking Officer will "conduct Arrestee Health Assessment (mental/physical), refer to 7.1 A for diversion of intake due to medical or mental health concerns. The Booking Officer is responsible for determining if the incoming arrestee requires any special considerations such as: significant injuries or illness or significant impairment due to influence of alcohol and/or drugs. According to Policy 7.1 A "Arrestee Health Assessment Diversion Procedures," the shift supervisor is responsible for diverting arrestees to a medical/mental health provider if the arrestee appears to have obvious significant injuries requiring medical attention or extreme incoherence due to influence of alcohol and/or drugs. Preliminary screening procedures, promulgated by the Sheriff's Department and VNA, direct the intake corrections staff to ask the arrestee upon arrival the medical questions on the medical admit form. If the inmate is found to have an urgent medical problem, the inmate is to be sent for immediate medical care to see the licensed nurse on duty or to the hospital. A copy of the medical admit form is to be placed in the nurse's file during booking, and the nurse is to review the forms the next working day and see the inmate for urgent health concerns.

---

[2] A certified medication aide cannot make medical decisions, and can only dispense prescribed medications. (Doc. 222-35, at 4.)

DCCF utilizes the "Spillman Jail Management System" to track inmates. When arrestees arrive for booking, as part of the medical assessment the Booking Officer conducts a BIA, which is incorporated in the Spillman system. The BIA includes medical and mental health questions that the officer reads to the arrestee and then inputs the arrestee's answers. If an inmate has previously taken the BIA, their previous answers should appear under each question. The system then generates red flags, including medical alert flags, to alert users of a potentially dangerous inmates or special care that needs to be taken. When the BIA is complete, two copies of the form are printed, one copy is set aside for nurses, the other goes into the In-Custody Inmate File. Medical alert flags do not appear on the printed forms and there is no written policy instructing officers what to do if a medical alert flag appears in the Spillman system.

Policies and procedures promulgated by the Sheriff's Department and the VNA also address detoxification. According to these policies, if the correction staff notices someone he/she feels is coming off drugs and alcohol and is showing symptoms, the inmate should be referred to the nurse. In two of the policies, a follow up call to the doctor is required. In one policy the call to the physician is permissive. The polices also do not define any clinical symptomatology would trigger the policy and leaves the discretion up to the corrections officer to decide if they feel the inmate is detoxifying. DCCF also has standing orders with protocols related to alcohol withdrawal which include multiple versions of alcohol withdrawal assessment scales. According to one of the scales, a score of "5" should be given for a previous history of withdrawal, and a score of "5" should be given for a history of alcohol-withdrawal seizures. This scale also includes scoring various symptoms the person is experiencing. Any score of 10 or above indicates moderate to severe withdrawal. Another assessment notes that "[p]ulse, temperature, and B/P will increase with withdrawal" and to "[a]lways check their chart. If they have been on Librium in the past for alcohol withdrawal they may need it again." (Doc. 222-34, at 20.)

According to plaintiffs, based on these assessments, Hammers should have been given a score of "10" based on her past history.

## II.   Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" factual dispute requires more than a mere scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party demonstrates an absence of evidence in support of an element of the case, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  The nonmoving party "may not rest upon the mere allegations or denials of his pleading."  *Id.*

In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 252.

## III.   Analysis

Plaintiffs bring multiple claims against the BOCC and against McGovern and Massey in their official and individual capacities.  The claims are as follows:

- Deliberate Indifference to Serious Medical Need and Failure to Provide Access to Medical Personnel for Evaluation and Treatment under 42 U.S.C. § 1983

- Failure to Train/Inadequate Training under 42 U.S.C. § 1983

- Failure to Supervise/Inadequate Supervision under 42 U.S.C. § 1983

- Wrongful Death

- Negligence

a. Official Capacity § 1983 Claims

Plaintiffs bring three claims under 42 U.S.C. § 1983 against defendants in their official capacity. The claims, however, all relate to defendants' municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  In *Monell*, the United States Supreme Court held that a municipality can be liable under § 1983 for violations of civil rights if the violation is the result of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. at 690. This "official policy" requirement distinguishes the act of the municipality from acts of the employees of the municipality, as municipality liability cannot derive from a theory of respondeat superior.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986).  A government, therefore, cannot be sued under § 1983 for injuries caused by its employees, rather, liability only attaches "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury."  *Monell*, 436 U.S. at 694.

Municipality liability may be imposed "for a single decision by municipal policymakers" when that decisionmaker "possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur*, 475 U.S. at 480–81; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[o]nly those municipal officers who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.").  Whether an official has final policymaking authority is a question of state law.  *Praprotnik*, 485 U.S. at 123.

Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell*, 436 U.S. at 690 n.55). An official capacity suit is not against the official personally, "for the real party in interest is the entity." *Id*. at 166.

Here, plaintiffs' § 1983 claims are based on three policies or practices: 1) policies and practices that resulted in a deliberate indifference to serious medical needs and failure to provide access to medical personnel for evaluation and treatment, 2) deliberately indifferent training, and 3) deliberately indifferent supervision. *See* Section 1983 Litigation Second Edition, 2008 WL 6983697 (noting that deliberately indifferent training and deliberately indifferent supervision or discipline are a type of policy and practice that may give rise to § 1983 liability.)

It is necessary first to determine who the proper parties are for the official capacity claims. Plaintiffs list the BOCC, Sheriff McGovern and Undersheriff Massey as defendants in their official capacities. In official capacity suits under §1983—which are claims against the governmental entity itself—the court must determine, as a matter of law, which defendants are "final policymakers," looking to state law for guidance. Under Kansas law, the sheriff is an independent elected official of the county. *See* Kan. Stat. Ann. § 19–801a; *Blume v. Meneley*, 283 F. Supp. 2d 1171, 1174 ("The sheriff is an independently elected officer whose office, duties, and authorities are established and delegated by the legislature. The sheriff is not a subordinate of the board of county commissioners . . . .") (quoting *Bd. of Cnty. Comm'rs of Cnty. of Lincoln, Kan. v. Nielander*, 62 P.3d 247 (Kan. 2003))). "The Board of County Commissioners has no authority to supervise, discipline, or remove the sheriff or his subordinates . . . [a]ccordingly, the conduct of the sheriff and his subordinates cannot be attributed to the county commissioners." *Lee v. Wyandotte Cnty, Kan.*, 586 F. Supp. 236, 238–39 (D. Kan. 1984). An undersheriff, according to Kansas law, serves at the pleasure of the sheriff. *See* Kan. Stat. Ann. § 19-

-10-

803.   In regard to jail management, "[t]he sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable."  Kan. Stat. Ann. § 19-811.  Therefore, the court finds Sheriff McGovern, in his official capacity, is the final policymaker when it comes to policies and procedures within the jail.  Claims against Undersheriff Massey in his official capacity are dismissed.

Because decisions regarding medical staff at the jail are also at issue, the court finds the BOCC is the final policymaker regarding the contracts made with Dr. Sale and VNA.  Evidence in the record shows that the contracts between the BOCC and Dr. Sale and VNA were drafted and signed by the BOCC.  Therefore, the BOCC is the final policymaker and liable entity for any injuries caused by policies in place regarding medical staff at the jail.

### i.   Count I - Deliberate Indifference to Serious Medical Need

Having decided the appropriate parties, the court must now determine whether defendants are entitled to summary judgment on plaintiffs' official capacity § 1983 claims.  Plaintiffs first allege that Hammers's constitutional rights under the Eighth and Fourteenth Amendment were violated because the BOCC and Sheriff McGovern promulgated policies, practices, and customs that were deliberately indifferent to the medical needs of DCCF inmates, including access to medical personnel.

The government has an obligation to provide medical care for "those whom it is punishing by incarceration."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Because an inmate must rely on prison officials to treat his medical needs, "if the authorities fail to do so, those needs will not be met."  *Id.* at 104.  Therefore, a deliberate indifference to serious medical needs of prisoners "constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment."  *Id.*  Whether the indifference is through a prison doctor's response to an inmate's needs or through an intentional delay or denial of access to medical care, the deliberate indifference to a prisoner's serious illness or injury

states a claim under § 1983. *Id*. at 104–05.  Under the due process clause in the Fourteenth Amendment, a pretrial detainee is entitled to the same degree of protection regarding medical care as a convicted inmate under the Eighth Amendment. *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992).  It is uncontroverted that Hammers was a pretrial detainee.

To grant summary judgment for defendants, the court must find that the evidence regarding defendants' deliberate indifference, viewed in the light most favorable to plaintiffs, is so one-sided that they are entitled to judgment as a matter of law.  Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  Deliberate indifference to the serious medical needs of prisoners is more than mere negligence in diagnosing or treating a medical condition. *Id.* at 835.  Rather, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id*. at 836.  Therefore, a prison official can only be found liable for deliberate indifference to prisoners' medical needs if the official "knows of and disregards an excessive risk to inmate health or safety." *Id*.  at 837.

For that reason, finding deliberate indifference to an inmate's serious medical needs involves both an objective *and* subjective requirement. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  To meet the objective component, the prisoner must produce evidence that the medical need was "sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).  A medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*  A delay in medical care is only a constitutional violation where the prisoner can show the delay resulted in "substantial harm" which may be satisfied by "lifelong handicap, permanent loss, or considerable pain." *Id.*

To meet the subjective prong of the deliberate indifference test, the prisoner must have evidence of "the prison official's culpable state of mind." *Id.* This test is met if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.* Whether an official has the requisite knowledge of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. . . ." *Farmer*, 511 U.S. at 842.

Defendants argue they are entitled to summary judgment because no Douglas County employee was deliberately indifference to Hammers's serious medical needs. Defendants claim no official was aware of Hammers's medical need during her incarceration and therefore plaintiffs cannot meet the subjective component of the deliberately indifferent test. Defendants emphasize the fact that when Hammers arrived at DCCF, no official noticed her demonstrating any signs of intoxication or withdrawal.

Plaintiffs, however, argue there is evidence in the record to show officials knew that many of their inmates come to DCCF intoxicated and that therefore they should have proper procedures in place to monitor detoxifying inmates, including having proper medical staff on-site. They also claim defendants knew of Hammers's prior history with alcohol withdrawal and alcohol withdrawal-related seizures because of the records from her prior incarcerations, and therefore were deliberately indifferent because the policies in place did not require any immediate assessment, care, or referral to medical staff.

The court finds there are factual disputes at issue as to whether defendants had the requisite knowledge and whether the policies in place were deliberately indifferent to Hammers's medical needs and ultimately caused her death. The court believes there is sufficient evidence in the record, including

expert testimony, that a reasonable jury may find for plaintiffs. Defendants' motion for summary judgment on Count I is denied.

> ii.   Counts II & III – Inadequate Training, Failure to Supervise

Plaintiffs also claim that defendants are liable under § 1983 for inadequate training and failure to supervise. The United States Supreme Court has recognized that a municipality's failure to provide training to employees, which caused a violation of constitutional rights, is actionable under § 1983 if "that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989). A plaintiff claiming inadequate training under § 1983 must show a specific training deficiency that, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifference to the need." *Id.* at 390. It is not sufficient to simply show that an injury or accident could have been avoided if an officer had better training. *Id.* at 391.

Plaintiffs claim Sheriff McGovern had the authority to train correctional officers at DCCF to recognize non-emergent serious medical conditions that do not require immediate diversion to an off-site health care provider but that do require prompt medical care, including the risk of alcohol withdrawal, and that the training program at DCCF was inadequate to train officers to do so. Defendants argue that this deficiency was not "so obvious" that it rises to the level of deliberate indifference under § 1983. In reviewing the evidence in the record, however, the court finds there are issues of fact as to whether the lack of training was obvious. Both parties have presented various versions of policies and assessments in place at DCCF used for evaluating inmates' medical conditions, including alcohol withdrawal. A jury may reasonably find, for example, that all the policies in place and the lack of a

consistent and comprehensive strategy for evaluating inmates' medical needs is a violation of § 1983. Defendants' motion for summary judgment on Count II is therefore denied.

Plaintiffs also claim that Sheriff McGovern had the authority to supervise all personnel assigned to DCCF, including the contracted doctor and nurses, to ensure compliance with policies and contracts, and he failed to do so. Plaintiffs, however, have not provided any evidence to show that any officials failed to comply with specific policies or contract provisions. To the extent plaintiffs are arguing that Sheriff McGovern failed to ensure officials were executing proper procedures to protect inmate health, that claim is sufficiently covered in Count II, inadequate training. Defendants' motion for summary judgment on Count III is granted.

b.   Individual Capacity § 1983 Claims

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Graham*, 473 U.S. at 165. Unlike official capacity claims—which require the entity itself be a "moving force" behind the deprivation—a personal-capacity claim requires only that an official, who is acting under the color of state law, caused the deprivation of a federal right. *Id.* at 166. Officials in personal-capacity suits may assert personal immunity defenses such as absolute or qualified immunity. *Id.* at 166–67 (finding that while absolute or qualified immunity is available in a personal-capacity suit, the only defense available in an official-capacity suit is sovereign immunity.). A judgment in a personal capacity suit is against only the individual defendant and not the entity that employs him. *Id.* at 168.

While supervisors may be liable for a subordinate's constitutional deprivations under certain circumstances, generally § 1983 does not recognize "strict supervisor liability." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162. Individual capacity claims must be based on "personal involvement in the alleged

constitutional violation." *Id.* Supervisory liability only applies if an affirmative link exists between "the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.*

Plaintiffs bring the same § 1983 claims against Sheriff McGovern and Undersheriff Massey in their individual capacities. Plaintiffs have not shown Sheriff McGovern was personally involved in the constitutional violations at issue or shown an "affirmative link" to render him liable for failure to supervise. Summary judgment as to any claims against Sheriff McGovern in his individual capacity is therefore granted.

*i. Qualified Immunity*

Plaintiffs seem to claim Undersheriff Massey is liable in his individual capacity based on his role as Corrections Division Undersheriff. Plaintiffs provide evidence that Undersheriff Massey was responsible for developing, approving, implementing, and overseeing any policies or procedures at DCCF dealing with inmate medical care. Plaintiffs have not shown any other conduct that would make Undersheriff Massey personally liable for Hammers's death. Defendants argue Undersheriff Massey is entitled to qualified immunity, because the law was not clearly established that any of his actions violated the constitution.

Qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a defendant has moved for summary judgment based on qualified immunity, the court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). A defendant is entitled to qualified immunity unless the plaintiff can show "(1) a reasonable jury could

find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.*  The Supreme Court has held a court has the discretion to consider "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In distinguishing between municipal and individual liability, the United States Supreme Court has held that it is possible to find municipal liability while still granting qualified immunity to an official for the same conduct because:

> The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, *so long as he conducts himself in good faith*, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole. And the public will be forced to bear only the costs of injury inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.

*Owen v. City of Indep., Mo.*, 445 U.S. 622, 657 (1980) (emphasis added).  It is therefore reasonable to find Undersheriff Massey is entitled to qualified immunity for his personal actions as Corrections Division Undersheriff so long as he was acting in good faith.

The court therefore will first address whether the law was clearly established that Undersheriff Massey violated Hammers's constitutional rights by implementing allegedly inadequate policies regarding inmate medical care.

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*  Determining when a law is clearly established ordinarily requires "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must

have found the law to be as plaintiff maintains." *Booker*, 745 F.3d at 427.  The Tenth Circuit has adopted a sliding scale approach to determine when law is clearly established. *Id*.  Under the sliding scale approach, "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to establish the violation." *Id*.

While there is an affirmative duty to provide adequate medical care to inmates, this duty requires only that government "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  Where a prison is providing "an adequate level of medical care by its own chosen means, the court should not impose its own notion of 'enlightened,' preferred medical policy." *Smith v. Bd. of Cnty. Comm'rs of Cnty. of Lyon*, 216 F. Supp. 2d 1209, 1224 (D. Kan. 2002).

While it is indeed clearly established that correctional facilities must provide adequate medical care to its inmates, it is not "clearly established"—for purposes of qualified immunity—that Undersheriff Massey's policies and procedures violated this right.  Qualified immunity is designed to protect officials who exercise their discretion—and while adequate health care is mandated, there is no indication Undersheriff Massey knowingly violated the law while approving and implementing medical procedures and policies for DCCF or acted in bad faith when doing so.  For these reasons, the court grants Undersheriff Massey qualified immunity for any claims against him in his individual capacity.

c.  State Claims

Plaintiffs also bring claims under state law for Wrongful Death and Negligence.  Plaintiffs claim defendants caused Hammers's death by failing to exercise reasonable and ordinary care, skill, and diligence in devising an adequate health care delivery system, in arranging for the provision of adequate medical/nursing services and medical record-keeping systems, in ensuring that Dr. Sale and VNA complied with the terms of their contracts, and in implementing adequate DCCF policies and procedures

to protect inmates and facilitate access to care.  Plaintiffs also claim defendants were negligent by deviating from generally accepted and recognized correctional practices and customs.

Defendants move for summary judgment on the state claims on various grounds including immunity under the Kansas Tort Claims Act.  Plaintiffs did not respond to defendants' arguments regarding the state law claims.

Under the Kansas Tort Claims Act, "a governmental entity generally is liable to the same extent as a private person 'for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment." *Kastendieck v. Bd. of Cnty. Comm'rs of Morris Cnty. Kan.*, 934 F. Supp. 387, 391 (D. Kan. 1996) (citing Kan. Stat. Ann. § 75-6103(a)).  There are several statutory exceptions to the general rule of liability.  *See* Kan. Stat. Ann. § 75-6104.

Defendants argue the "discretionary function" exception and the "personnel policy" exception immunize them from liability in this case.  *See* Kan. Stat. Ann. § 75-6104(e),(d).  Under the discretionary function exception, a party is immune from liability if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."  Kan. Stat. Ann. § 75-6104(e).  The personnel policy exception exempts liability for damages due to the "adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured."  Kan. Stat. Ann. § 75-6104(d).

Whether a function is "discretionary" depends on the nature and quality of the act.  *Carl v. City of Overland Park, Kan*., 65 F.3d 866, 871 (10th Cir. 1995).  "'Discretion' requires more than 'the mere exercise of some judgment,' because judgment is exercised in nearly all endeavors; instead, a discretionary function 'must involve some element of policy formation."  *Id.*  The discretionary function,

however, is not applicable in situations where a legal duty exists, if the duty was established by caselaw or statute. *Conrad v. Bd. of Johnson Cnty. Comm'rs*, 237 F. Supp. 2d 1204, 1261 (D. Kan. 2002). Therefore, a governmental entity cannot claim immunity if the conduct complained of violates a legal duty." *Id.* The personnel policy, on its face, also makes clear that immunity does not apply when a duty of care exists. Kan. Stat. Ann. § 75-6104(d) (". . . unless a duty of care, independent of such policy, is owed to the specific individual injured.").

Kansas law recognizes that a "county maintaining a jail owes a duty of care to the inmates housed there." *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 961 (Kan. Ct. App. 2011). A county owes a duty of reasonable care to inmates "because they are not at liberty to meet their own needs and, thus, must depend upon those who hold them." *Id.* This reasonableness standard "allows individual facilities a necessary flexibility in adopting procedures and practices to meet their obligations without undue burden or cost." *Id.* at 962. Importantly, no blanket immunity for penal institutions exists, signaling a "legislative determination that those facilities should be subject to liability for otherwise actionable negligence." *Id.* at 962–63 ("Had the legislature meant to impose no greater duty or obligation than the constitutional minimum, it would have adopted a specific tort claim exception . . . immunizing jails and prisons for their treatment of inmates.").

Because correctional facilities owe inmates a duty of care, the court finds the discretionary function or personnel policy exceptions do not immunize defendants from liability. And because a legal duty exists, the court finds that enough evidence exists that a reasonable jury could find defendants breached their duty to "exercise reasonable and ordinary care for the life and health of the prisoner" and to "furnish medical attention to a prisoner in custody who is in need of medical attention." *Thomas v. Cnty. Comm'rs of Shawnee Cnty.*, 262 P.3d 336, 347 (Kan. 2011).

Defendants also argue that plaintiffs' negligence claim is barred by the statute of limitations because it is not "substantially similar" to the original action and is therefore not preserved under the Kansas saving statute. Under Kan. Stat. Ann. § 60-518, a claim brought after the statute of limitations is barred unless a second suit is filed and the saving statute, applies which requires:

   1)  The first action was commenced within due time,

   2)  The first action failed "otherwise than upon the merits,"

   3)  And the new action was commenced within six months of the failure.

*Taylor v. Casey*, 182 F. Supp. 2d 1096, 1102 (D. Kan. 2002). Defendants concede that these factors are met, but argue that the saving statute only applies if the original action and the subsequent action are substantially the same. *See Taylor v. Int'l Union of Elec., Salaried, Mach., & Furniture Workers*, 968 P.2d 685 (Kan. Ct. App. 1998) ("'*Where the parties and the relief sought in the new action are different from those in the original action, the actions are not substantially the same, and the saving statute does not apply*.'") (emphasis in original). Defendants argue that plaintiffs' first action included a wrongful death claim but not a claim for negligence. Defendants argue the negligence claim is not similar enough to the wrongful claim. The court disagrees. The elements of the two claims are substantially similar and originate from the same conduct. The savings statute applies and the negligence claim is not barred by the statute of limitations.

Finally, defendants argue that plaintiffs are not entitled to punitive damages as there is no evidence that they acted toward Hammers in a willful or wanton manner. Punitive damages may be awarded if a plaintiff shows by clear and convincing evidence that "the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud, or malice." Kan. Stat. Ann. § 60-3702(c). The term "wantonness" under Kansas law means "a reckless disregard of the rights of others." *Allman v. Bird*, 353 P.2d 216, 219 (Kan. 1960). "[T]o constitute wantonness the acts complained of must show

not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not." *Id.* Because the court has already found a question for the jury exists as to whether defendants acted with "reckless disregard" on the constitutional claims, the court finds it appropriate for a jury to determine whether plaintiffs are entitled to punitive damages.

For these reasons, the court denies defendants' motion for summary judgment on plaintiffs' state law claims of wrongful death and negligence.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment (Doc. 208) is granted in part and denied in part. Defendants' motion as to Counts I and II against the BOCC and Sheriff McGovern in their official capacities is denied. The motion is granted as to Count III against the BOCC and Sheriff McGovern in their official capacities. The motion is granted as to Counts I, II, and III against Undersheriff Massey in his official capacity. The motion is granted as to Counts I, II, and III against Sheriff McGovern in his individual capacity. Summary judgment on Counts I, II, and III against Undersheriff Massey in his individual capacity is granted. Defendants' motion as to Count IV, Wrongful Death and Count XI, Negligence is denied.

Dated March 28, 2018, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**